# United States Bankruptcy Appellate Panel
## For the Eighth Circuit

_____

No. 19-6025

_____

In re: Family Pharmacy, Inc.; Family Pharmacy of Missouri, LLC; HealthTAC Logistics, LLC; Family Property Management, LLC; Family Pharmacy of Strafford, Inc.

*Debtor*s

------------------------------

The Bank of Missouri

*Creditor - Appellant*

v.

Family Pharmacy, Inc.; Family Pharmacy of Missouri, LLC; HealthTAC Logistics, LLC; Family Property Management, LLC; Family Pharmacy of Strafford, Inc.

*Debtors - Appellees*

JM Smith Corporation; Smith Management Services, LLC

*Creditors - Appellees*

_____

Appeal from United States Bankruptcy Court
for the Western District of Missouri - Springfield

_____

Submitted: February 19, 2020
Filed: March 19, 2020

_____

Before SALADINO, Chief Judge, SCHERMER and SHODEEN, Bankruptcy Judges.

—————————

SALADINO, Chief Judge.

The Appellant, the Bank of Missouri ("BOM"), appeals the order of the bankruptcy court denying its motion under 11 U.S.C. § 506(b) for allowance of postpetition default interest. We have jurisdiction over this appeal. *See* 28 U.S.C. §158(b). For the reasons that follow, we reverse and remand.

## STANDARD OF REVIEW

On appeal from a final judgment, the appellate court reviews the bankruptcy court's legal decision using a *de novo* standard and reviews factual findings for clear error. *Fix v. First State Bank of Roscoe*, 559 F.3d 803, 808 (8th Cir. 2009). This case primarily involves review of the bankruptcy court's interpretation and application of § 506(b) under a *de novo* standard. *See United States v. Brummels*, 15 F.3d 769, 771 (8th Cir. 1994) (stating that standard of review for the lower court's ''application of facts to the legal interpretation'' of a statute is *de novo* ); *Wegner v. Grunewaldt*, 821 F.2d 1317, 1320 (8th Cir. 1987) (stating that reviewing court considers bankruptcy court's statutory constructions *de novo*).

## FACTUAL BACKGROUND

The facts are not disputed.[1]

—————————

[1]The parties agreed to submit this matter to the court based on a joint stipulation of facts and agreed admissibility of certain documents in addition to live testimony from the BOM's loan officer. Jt. Stip. of Facts & Agreement Related to the

(continued...)

Debtor Family Pharmacy, Inc., and four related entities (collectively, the "Debtors") filed voluntary petitions for Chapter 11 relief on April 30, 2018. Debtors' assets consisted primarily of inventory, equipment and real estate used in operating pharmacies in southwest Missouri. Those assets were encumbered by three secured creditors, in order of priority: The Bank of Missouri, owed approximately $11 million; Cardinal Health, $1 million, and J M Smith Corporation and Smith Management Services, LLC (collectively, "Smith"), $18 million.

Early in the case, Debtors and their creditors determined that the assets needed to be sold at an auction sale free and clear of liens pursuant to 11 U.S.C. § 363. Smith, the Debtors' primary supplier, agreed to advance debtor in possession financing and to serve as the so-called stalking horse bidder for the sale with an $8 million opening bid.

The court promptly entered orders approving Debtors' interim and final motions for use of debtor in possession financing and use of cash collateral, and approving bid procedures for the sale. The auction drew substantial interest and on August 8, 2018, the bankruptcy court entered its sale order approving Smith as the purchaser with a final bid of $13,975,000. Under the terms of the sale order and subsequent stipulations with various claimants, the sales proceeds (after various fees and closing costs) were disbursed to BOM and Cardinal Health, leaving excess sales proceeds of approximately $556,040.59.

Under its stipulation with the Debtors, BOM received $11,300,440.67, which represented its full principal balance, estimated interest at the non-default rate set forth in its loan contracts, certain fees and expenses, less its share of the broker's fee

---

[1](...continued)
Admissibility of Certain Exhibits By and Between Debtors, J M Smith Corporation, Smith Management Services, LLC, and the Bank of Missouri (ECF No. 328) ("Joint Stipulation").

for the sale. The parties reserved any issues as to BOM's entitlement to additional interest, fees or charges. BOM, as an oversecured creditor, later filed its motion under 11 U.S.C. § 506(b) seeking allowance of $18,271.19 in postpetition attorneys fees plus $442,843.51 in interest calculated at an 18% default rate. The Debtors and Smith jointly objected to BOM's motion. Smith is owed approximately $16 million on account of its undersecured secured claim.

At the hearing on the BOM's motion, the Debtors and Smith agreed to allowance of the BOM's attorney fees, leaving only the default interest at issue.

BANKRUPTCY COURT DECISION

The bankruptcy court denied BOM's motion to enforce the default interest provisions for two alternative reasons. First, the bankruptcy court held the default interest rate constituted an unenforceable penalty under Missouri law. In so doing, the bankruptcy court held that under Missouri law, courts refuse to enforce liquidated damages clauses found to be improper penalties. Using this standard, the bankruptcy court concluded that BOM's default interest rate constituted an unenforceable penalty. Second, and as an alternative holding, the bankruptcy court held that the default interest rate could not be enforced based on "equitable considerations."

Before reaching its alternative holdings, the bankruptcy court briefly addressed the issue of whether the default interest rate had even been triggered under the terms of the contracts. The bankruptcy case was filed on April 30, 2018. The parties are in agreement that on that date, the loans were not in default. Under the express terms of the promissory notes, the next scheduled payments were due May 1, 2018. It is undisputed that the debtors did not make those or any subsequent postpetition payments. BOM argued that its default interest rate was automatically triggered when the payments were not made on May 1. The Appellees argued that they were excused from making postpetition payments absent a court order, and should not be held in

-4-

default. Noting that the caselaw on the subject was "murky," and due to its alternative holdings, the bankruptcy court did not rule on the default issue.

DISCUSSION

BOM asserts three assignments of error by the bankruptcy court. First, it asserts the court erred in finding the default interest rate under its loan documents constituted an unenforceable penalty under Missouri law. Specifically, BOM asserts that it was erroneous to apply a liquidated damages vs. penalty analysis to a contractual rate of interest set forth in a promissory note. Second, BOM asserts that it was erroneous for the bankruptcy court to weigh "equitable considerations" under the plain language of 11 U.S.C.§ 506(b). Finally, even though the bankruptcy court declined to opine on the issue, BOM argues that to the extent the bankruptcy court based its holding on a lack of default or a lack of notice, that too is erroneous under the express language of the loan documents.

## *11 U.S.C.§ 506(b)*

It is undisputed that BOM is entitled to "interest" on its claims. 11 U.S.C.§ 506(b) provides:

> To the extent that an allowed secured claim is secured by property the value of which, after recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided under the agreement or State statute under which such claim arose.

In *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235 (1989), the Supreme Court held that § 506(b) allows all oversecured creditors, including those holding nonconsensual liens, to recover postpetition interest on their claims. *Id*. at

-5-

241. In doing so, the Supreme Court rejected the pre-Code practice of treating consensual and nonconsensual liens differently, saying it could not discern "any significant reason why Congress would have intended, or any policy reason would compel, that the two types of secured claims be treated differently in allowing postpetition interest." *Id*. at 243. The Supreme Court concluded that this result was mandated by the plain language of the statute and is "unqualified." *Id*. at 241.

However, the right of an oversecured creditor to recover "fees, costs and charges" *is* qualified. Under the plain language of the statute, those recoveries are allowed only if provided for in the parties' agreement and only if the court determines they are reasonable. *Id.* at 241-42. In holding that the right to interest was "unqualified," the Supreme Court was saying that the qualifications applicable to the right to recovery of fees, costs and charges under § 506(b) – that they must be provided for in an agreement and must be reasonable – are not applicable to any oversecured creditor's entitlement to interest.

Although the *Ron Pair* holding is clear that all oversecured creditors are entitled to postpetition interest, the Supreme Court did not set the rate at which an oversecured creditor is entitled to recover postpetition interest. Since *Ron Pair*, "most courts have concluded that 'postpetition interest should be computed at the rate provided in the agreement, or other applicable law, under which the claim arose – the so-called contract rate of interest.'" *White v. Coors Distrib. Co. (In re White),* 260 B.R. 870, 879 (B.A.P. 8th Cir. 2001) (citations omitted). In *White*, we affirmed the bankruptcy court's decision that an assignee of the original lender was entitled to collect postpetition interest under Nebraska law and under § 506(b) at the 18% rate specified in the contract.

***The Contract Rate of Interest.***

The bankruptcy court found that between July 21, 2014, and March 1, 2018, BOM made eight loans to the Debtors. The individual promissory notes have non-default interest rates ranging between 3.65% and 7.5%. Other than these non-default interest rates and the maturity dates which vary from loan to loan, the relevant terms of the notes are, for all practical purposes, identical. The notes provide that "[u]pon default, including failure to pay upon final maturity, the interest rate on this Note shall be increased to 18.000% per annum based on a year of 360 days." A "default" is triggered when the "Borrower fails to make any payment when due under this Note." These findings of the bankruptcy court are not challenged by any party to this appeal.

It is also undisputed that the Debtors were current on all of the loans on April 30, 2018, when they filed bankruptcy. The bankruptcy court record reflects that when BOM originally filed its proofs of claim in the bankruptcy case, it referenced only the non-default contractual rates of interest for each loan. In fact, based on the stalking horse bid of $8,000,000.00 for the debtor's assets, it appeared BOM was an *undersecured* creditor. After the auction it became apparent that BOM was oversecured and it began the process of claiming a right to default interest.

***Default***

Subsumed in all of BOM's assignments of error on appeal are its assertions that (i) the debtors became in default on the loans when they failed to make any of the payments that became due on May 1, 2018, which was the day after bankruptcy filing; and (ii) upon such default, the interest rate automatically increased to the default rate of 18% per annum. However, as indicated, the bankruptcy court did not opine on this issue.

Appellees do not disagree with BOM's assertions about what the documents say. However, they assert the bankruptcy court was correct in holding that the presumption in favor of the contract rate of interest applies only if the rate is enforceable under applicable non-bankruptcy law, and even then may be modified by the bankruptcy court if equitable considerations so demand.

The issues on appeal are: (i) whether it was erroneous to apply a liquidated damages vs. penalty analysis to a contractual rate of interest set forth in a promissory note; and (ii) whether the bankruptcy court properly considered equitable factors in denying the lender's claim for default interest.

### *Applicability of Liquidated Damages vs. Penalty Analysis.*

Section 502 of the Bankruptcy Code provides that the bankruptcy court shall allow a claim ''except to the extent that — (1) such claim is unenforceable against the debtor . . . under . . . applicable law[.]'' 11 U.S.C. § 502(b)(1). The Supreme Court in *Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric Co.*, 549 U.S. 443, 450 (2007), affirmed that "[c]reditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code." Here, the parties agree that the substantive law of the state of Missouri is applicable to the notes at issue.

The bankruptcy court found, and the parties do not dispute, that Missouri statutory law permits parties to certain types of loans, such as those at issue here, "to agree in writing to *any* rate of interest, fees, and other terms and conditions[.]" Mo. Ann. Stat. § 408.035 (West) (emphasis added). The bankruptcy court then segued into an analysis of liquidated damage provisions and penalty clauses, determining for various reasons that BOM's default interest rate constituted an unenforceable penalty under Missouri law.

The concepts of default interest and liquidated damages are often conflated, but it is important to differentiate between the two. We explained the distinctions in 1998 when ruling on a South Dakota employment agreement:

> Although default interest and liquidated damages are similar in concept, the differences between the two are readily discernible, especially when applied to the facts in this case. When the term "default interest" is used, "default" refers to an event in a debtor-creditor relationship that triggers certain consequences typically set out in a loan document. One such consequence may be the escalation of the interest rate on remaining indebtedness, hence the term "default interest." In contrast, "liquidated damage" usually refers to a specific sum of money expressly stipulated as the amount of damages to be recovered for breach by either party to an agreement. *Stein v. Bruce*, 366 S.W.2d 732, 735 (Mo. App. 1963).

*Direct Transit, Inc. v. S. Dakota Governor's Office of Econ. Dev. (In re Direct Transit, Inc.)*, 226 B.R. 198, 201 (B.A.P. 8th Cir. 1998) (internal citations omitted).

*Direct Transit* involved two economic development loans from the state, memorialized by promissory notes and secured by real and personal property and a letter of credit, and a separate agreement that Direct Transit would maintain business operations in South Dakota – and, presumably, the employment of South Dakota residents – for a period of eight years. The parties' agreement contained express language whereby Direct Transit would pay a specific sum to the state economic development office if Direct Transit changed the nature of the project, relocated, or ceased operations so that a loss of employment resulted. In ruling that the liquidated damages provision was enforceable under South Dakota law and the Bankruptcy Code, the Bankruptcy Appellate Panel noted that the terms of the employment agreement and the terms of the promissory notes were separate, and Direct Transit could have been in default on the promissory notes without incurring liability for liquidated damages as long as it continued to operate in accordance with the

-9-

employment agreement. "The liquidated damages provision became due for a non-monetary breach of the contract rather than for a default under the terms of the note. Therefore, the provision in question is a true liquidated damages provision and not a default rate of interest." *Id.*

Other courts have also found that default interest provisions are not subject to a liquidated damages vs. penalty analysis. *See In re 3MB, LLC,* 609 B.R. 841, 848 (Bankr. E.D. Ca. 2019) (noting that default interest has long been allowed in California without resorting to a liquidated damages analysis); *In re 785 Partners LLC,* 470 B.R. 126, 131 (Bankr. S.D.N.Y. 2012) (citing with approval a New York state court case holding that an agreement to pay interest at a higher rate after default is an agreement to pay interest and not a penalty).

In contrast, a more recent Eighth Circuit case *did* review a default interest rate using a liquidated damages analysis under Minnesota law. *Bowles Sub Parcel A, LLC v. Wells Fargo Bank, N.A. (In re Bowles Sub Parcel A, LLC)*, 792 F.3d 897 (8th Cir. 2015). However, a careful review of that opinion and its history reveals that it does *not* stand for the proposition that a liquidated damages analysis should be applied to default interest rates. Instead, the Eighth Circuit opinion does not address that issue at all, indicating the court simply addressed the issues as presented by the parties. Clarity can be found, however, in the opinion of the United States District Court that preceded the Court of Appeals decision – *Bowles Sub Parcel A, LLC v. Wells Fargo Bank, N.A. (In re Bowles Sub Parcel A, LLC)*, 2013 WL 6500130 (D. Minn. Dec. 11, 2013). In that opinion, the District Court said:

> Default interest clauses are distinguishable from liquidated damages clauses because the latter provide for a fixed amount of damages in the event of a breach, *see In re Qwest's Wholesale Serv. Quality Standards*, 702 N.W.2d 246, 262 (Minn. 2005), whereas default interest clauses cause the interest rate on whatever indebtedness remains at the time of default to escalate to a higher percentage, *see In re Direct Transit, Inc.*,

226 B.R. 198, 201 (B.A.P. 8th Cir. 1998). In other words, the monetary consequences of a default interest clause differ depending on when the default occurs, while the same is not true of a typical liquidated damages clause. Despite this slight difference, the Bankruptcy Court applied a liquidated damages analysis to the default interest provision and the parties do not contest that this is the appropriate analysis.

*Id.* at *4, n.3.

In any event, the question that faced the bankruptcy court in the instant case is whether a default interest rate would be subjected to a liquidated damages vs. penalty analysis under Missouri law. The bankruptcy court found that it would. After acknowledging that an 18% rate of interest is per se legal under Missouri law, the bankruptcy court then engaged in an analysis of valid liquidated damage clauses versus invalid penalty provisions. It noted that under the loan documents, default occurs immediately upon a failure to pay and the default interest rate applies immediately upon default and without notice. It also noted the loans had cross-default provisions and that the spread between the default and non-default rates ranged from 10.5% to 14.5%. The bankruptcy court held that there was no evidence that such a large spread was a "reasonable" prediction of the harm caused by a default.

However, as BOM correctly points out, neither party was able to point to a single case under Missouri law which applied a liquidated damages analysis to a contractual interest rate set forth in a promissory note. As the bankruptcy court correctly found, the default rate of interest in the BOM notes is a lawful rate of interest under Missouri law. No Missouri cases have been presented to us to support the proposition that an otherwise lawful interest rate can or should be denied or reduced under such an analysis.

Further, applying the liquidated damages analysis to a contractual interest rate brings into play "reasonableness" factors that simply are not applicable to interest

-11-

rates under 11 U.S.C.§ 506(b). In *Ron Pair*, the Supreme Court was clear that the right to interest is "unqualified" by the reasonableness language that qualifies a creditor's right to fees, costs and charges. 489 U.S. at 241. Therefore, the bankruptcy court erred in applying a liquidated damages analysis and ruling the default interest rate was an unenforceable penalty.

***Equitable Considerations.***

The bankruptcy court ruled in the alternative that "the equities of this case under applicable federal bankruptcy law mandate disallowance of default interest" on BOM's claim. In reviewing equitable considerations, the bankruptcy court was following what is likely the majority position since *Ron Pair* – "[w]hat emerges from the post-*Ron Pair* decisions is a presumption in favor of the contract rate subject to rebuttal based upon equitable considerations." *In re Terry Ltd. P'ship,* 27 F.3d 241, 243 (7th Cir. 1994) (citations omitted). In its analysis, the bankruptcy court considered such factors as the spread between the default and the non-default rates and the fact that BOM did not begin to assert a claim to default interest until it appeared that the auction would produce unexpected results.

While we acknowledge that the bankruptcy court followed the majority rule in applying equitable considerations to its analysis, we note that the Eighth Circuit has not yet ruled on the issue. We also note that despite the temptation to look beyond the statutory language to effect a resolution, the United States Supreme Court has unequivocally expressed its preference for staying within the lines:

> The task of resolving the dispute over the meaning of § 506(b) begins where all such inquiries must begin: with the language of the statute itself. *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 685, 105 S. Ct. 2297, 2301, 85 L. Ed.2d 692 (1985). In this case it is also where the inquiry should end, for where, as here, the statute's language is plain, "the sole function of the courts is to enforce it according to its terms."

> *Caminetti v. United States*, 242 U.S. 470, 485, 37 S. Ct. 192, 194, 61 L.
> Ed. 442 (1917).

*Ron Pair*, 489 U.S. at 241.

The Supreme Court emphasized this later in the same opinion:

> The plain meaning of legislation should be conclusive, except in
> the "rare cases [in which] the literal application of a statute will produce
> a result demonstrably at odds with the intentions of its drafters." *Griffin
> v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S. Ct. 3245, 3250,
> 73 L. Ed.2d 973 (1982). In such cases, the intention of the drafters,
> rather than the strict language, controls. *Ibid.* It is clear that allowing
> postpetition interest on nonconsensual oversecured liens does not
> contravene the intent of the framers of the Code. Allowing such interest
> does not conflict with any other section of the Code, or with any
> important state or federal interest; nor is a contrary view suggested by
> the legislative history.

*Id.* at 242-43. *See also Law v. Siegel*, 571 U.S. 415, 426 (2014) ("*Marrama* most certainly did not endorse, even in dictum, the view that equitable considerations permit a bankruptcy court to contravene express provisions of the Code."); *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 452 (2007) ("Consistent with our prior statements regarding creditors' entitlements in bankruptcy, we generally presume that claims enforceable under applicable state law will be allowed in bankruptcy unless they are expressly disallowed.") (internal citation omitted); and *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988) ("[W]hatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code."). More recently, the Supreme Court has expressed a need to place limitations on judicial lawmaking – or federal common law. *Rodriguez v. Federal Deposit Insurance Corp.*, ___ U.S. ___, 140 S. Ct. 713, 718 (2020).

Of course, we recognize that the statute in this case does not define the rate of interest to be applied. However, the affinity for weighing equitable concerns in determining claims has strayed beyond the circumstances in which it is most useful and into situations where the statute itself provides the answer in a more straightforward and less time-consuming manner. Simply put, no section of the Bankruptcy Code gives the bankruptcy court authority, equitable or otherwise, to modify a contractual interest rate prior to plan confirmation. In this case, the bankruptcy court need not have considered equitable factors in deciding the matter at hand.

As an oversecured creditor, BOM has an unqualified right to postpetition interest under § 506(b), and that interest should be computed at the rate – default as well as non-default – provided in the parties' agreement, as long as those rates are allowed under state law. *White*, 260 B.R. at 879. Here, the default rate of interest was agreed to by the parties to the promissory notes and all parties agree it is a legal rate under state law. There have not been any allegations of misconduct by BOM, whether in the making of its loans or in the course of the bankruptcy case. Nor have the appellants recited any basis for not enforcing the contract rate under Missouri law. Accordingly, absent some compelling reason to the contrary, BOM should be permitted to collect interest at that rate if the notes are in default.

## CONCLUSION

In summary, we make no decision as to whether and when the default interest rates under the notes at issue were triggered under the facts of this case. Those decisions are mixed questions of law and fact that are best left for the bankruptcy court to decide in the first instance. Further, we endorse the view that post-*Ron Pair*, the pre-confirmation interest rate to be applied under § 506(b) to an oversecured creditor whose claim is evidenced by a promissory note or similar loan agreement is the contract (both non-default and default) rate set forth in the note or loan agreement,

to the extent enforceable under applicable law.[2] Also, absent state law to the contrary, a liquidated damages vs. penalty analysis is not applicable and should not be applied to a default interest rate set forth in a promissory note or similar loan agreement. Finally, we follow the rule that equitable considerations should be used sparingly and only in exceptional circumstances.

Accordingly, the decision of the bankruptcy court is reversed. Because the issues of whether and when the loans became in default and subject to the default rate of interest were not decided by the bankruptcy court, we will remand this case for a determination of those issues, and further proceedings consistent with this opinion.

_____

[2]Of course, the rate may properly be modified post-confirmation though the plan confirmation process.